# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ADRIENNE COCKLE,        )
        )
    Plaintiff,    )
        )    **No. 11 C 6689**
    v.        )
        )    **Magistrate Judge**
**CAROLYN W. COLVIN, Acting**    )    **Maria Valdez**
**Commissioner of Social Security,**[1]    )
        )
    Defendant.    )
        )

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying plaintiff Adrienne Cockle's claim for Supplemental Security Income and Disability Insurance Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Cockle's motion for summary judgment [Doc. No. 19] is granted in part and denied in part, and the matter is remanded to the Commissioner for further proceedings.

---

[1] Carolyn W. Colvin is substituted for her predecessor Michael J. Astrue pursuant to Federal Rule of Civil Procedure 25(d).

## BACKGROUND

## I.    PROCEDURAL HISTORY

Cockle originally applied for Supplemental Security Income and Disability Insurance Benefits on May 24, 2006, alleging a disability since August 5, 2004.[2] (R. 122-23, 143.) Her application was denied on July 21, 2006 and upon reconsideration on March 2, 2007. (R. 78-89.) Cockle filed a timely request for a hearing by an Administrative Law Judge ("ALJ"), which was held on May 6, 2009. (R. 92, 102-09.) Cockle personally appeared and testified at the hearing and was represented by counsel. (R. 28-77.) A vocational expert also testified. (*Id*.)

On May 20, 2009, the ALJ issued a decision denying Cockle's claim for benefits, finding her not disabled under the Social Security Act. (R. 11-23.) The Social Security Administration Appeals Council denied Cockle's request for review on July 28, 2011, (R. 1-6), leaving the ALJ's decision as the final decision of the Commissioner and therefore reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

---

[2] During the ALJ hearing, Plaintiff's attorney amended the onset date to November 1, 2006, in light of evidence of drug and alcohol use through October 31, 2006. (R. 33.)

## II.  FACTUAL BACKGROUND

### A.  Background

Cockle was born on February 4, 1982. (R. 122.) She did not graduate from high school but was enrolled in a GED prep course at the time of the hearing. (R. 37-38.) She lives alone in a subsidized apartment. (R. 55-57.) Cockle's work history was very limited and sporadic; as of the date of the hearing, she had been working part-time as an inventory clerk, making only a total of $297.11 in wages from December 2008 through March 2009. (R. 16, 190.) Cockle claims disability due to leg pain stemming from an August 6, 2004 car accident, as well as mental disorders. (R. 79.)

### B.  Testimony and Medical Evidence

#### 1.  *Cockle's Testimony*

Cockle testified that at her current job, she counts products by scanning a barcode. (R. 37.) She stated that she often gets in trouble for miscounting, moving too slowly, sitting on the floor, and wandering around. (R. 37-39, 58-60, 75-76.) She would not be able to work a job where she had to stand up for long periods of time due to leg pain. (R. 39-41.) She does not have a problem with sitting, and she can lift up to fifteen pounds. (R. 44-45.) Cockle has the physical ability to type despite difficulty turning her hand, but her typing speed is poor, at ten words per minute. (R. 61-62.)

Cockle twice attempted suicide, including the car accident that caused her leg injury. (R. 50-51.) Cockle had been receiving mental health treatment for several

years, and she testified that she continued to have feelings of depression. She described various incidents in which she had great difficulty dealing with her anger and was attending outpatient counseling for anger management. (R. 47-49, 52-53.) She said that she holds her feelings in a lot, "until the point I just burst out." (R. 48.) Cockle has a problem with concentration when people talk to her for a long time. (R. 46.) Cockle is often anxious and fearful when she is around a lot of people, and in those situations, she has trouble concentrating and understanding. (R. 49-50, 61.)

### 2. *Medical Evidence*[3]

Dr. Piyush C. Buch completed an Advocate Christ Medical Center admission assessment for Cockle on August 24, 2004, following her August 6 car accident, which caused multiple fractures, multiple blunt trauma, and head injury. (R. 207.) He reported that there was "evidence of significant deterioration in her cognitive functioning" and that her "[i]nsight and judgment were impaired." (*Id.*) Dr. Buch diagnosed Cockle with an adjustment disorder and diminished cognitive functioning secondary to head injury, finding no current evidence of depression. He further stated that active psychiatric intervention was not feasible at that time. (*Id.*)

On December 26, 2004, Cockle was taken from the Regal Health nursing home, where she had been staying for post-accident rehabilitation, to the emergency

---

[3] The summary of the medical record discusses only the evidence of Cockle's mental limitations because the evidence relating to Cockle's physical limitations is not relevant for purposes of this appeal. Plaintiff does not dispute the ALJ's finding that she retains the physical RFC for sedentary work with a fifteen-pound lifting restriction.

room for psychological evaluation after she exhibited an altered mental status and combative behavior, along with alcohol and drug abuse. (R. 380-81.) She swore at other residents and was found naked from the waist down behind the nurse's station. (R. 381.) Notes from Regal Health reveal that Cockle had a history of being combative, threatening, and aggressive with other residents and staff. (*See, e.g.,* R. 418-23.)

Cockle was admitted to Loretto Hospital on May 31, 2005 with an admitting diagnosis of schizoaffective disorder unspecified, a principal diagnosis of psychosis, and a secondary diagnosis of cannabis abuse unspecified. (R. 473.) She was referred to the hospital after becoming physically aggressive at Community Care Center, attempting to hit and bite the nursing staff. (*Id.*) As a result of her aggressive and hostile behavior, she was also unable to function or care for herself. (*Id.*) Cockle spent eleven days in the hospital and was treated with medication and psychotherapy before being discharged back to the nursing facility. (R. 474.)

On October 31, 2006, Plaintiff was admitted to St. Anthony Hospital with depression, feelings of hopelessness, intense anxiety, and recent intoxication on cocaine and cannabis. (R. 619.) She was discharged on November 20, 2006 following treatment including individual counseling and medication management. (*Id.*)

On January 9, 2007, Dr. John W. O'Donnell completed a psychiatric evaluation for the Bureau of Disability Determination Services ("DDS") after interviewing Cockle for sixty minutes. (R. 648-54.) She appeared for the evaluation appropriately groomed and clothed. She had a slight limp with her left leg, but she

did not use a cane. (R. 648.) Plaintiff's attitude and degree of cooperation were fair, and her posture varied from sitting normally to lying halfway over the arm of her chair, looking down at the floor. (*Id.*)

Cockle reported to Dr. O'Donnell she had been moved to four or five nursing homes in the previous year as a result of her attitude, and she also described her difficulty with people as well as the mood swings caused by her bipolar disorder. (R. 649.) Her down periods lasted three or four days, and her up periods lasted one to two days at most. (*Id.*) Plaintiff had a history of substance abuse, including alcohol, marijuana, and cocaine, but she stopped using all three substances in October 2006 following her hospitalization at St. Anthony. (R. 650.) Dr. O'Donnell diagnosed Cockle with Bipolar Disorder NOS, with polysubstance abuse in early sustained remission, and Personality Disorder NOS, with a guarded prognosis. (R. 654.)

On February 14, 2007, the DDS interviewed Edward Turner, Cockle's caseworker at the time. (R. 174-75.) Turner reported that Cockle had resided at the Community Mental Health Council Acute Care Program for almost three months and spent her days in a structured day treatment program. (R. 174.) She was diagnosed with depression and bipolar, with evident mood swings. (*Id.*) She cried about twice a week with depression, and when depressed, she withdrew and did not want to be around others. (R. 174.) Approximately once a week, Cockle heard voices that would tell her she could go and get a job, and they would question why she was at the facility; the voices interfered with conversations and disoriented her. (*Id.*) She did not follow instructions well, had a short attention span, and became

frustrated with any task she did not understand. (*Id.*) During her depressive periods, Cockle did not get along with anyone and would often get into verbal arguments. (*Id.*) When she was not depressed, she was generally cooperative, talkative, could carry on an appropriate conversation, and got along with other residents. (*Id.*) She was frequently fearful of going outside with staff, because she thought someone might try to rob her or hit her. (R. 174-75.)

Dr. Carl Hermsmeyer, Ph.D., completed a Psychiatric Review Technique ("PRT") on February 27, 2007. (R. 655-68.) He reviewed Cockle's medical record based upon the categories of Affective Disorders (Listing 12.04), Personality Disorders (Listing 12.08), and Substance Addiction Disorders (Listing 12.09). (R. 655.) Under the "B" criteria of the listings, he found mild limitations in her activities of daily living; moderate limitations in maintaining social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. 665.) Dr. Hermsmeyer also found that the evidence did not establish the presence of the "C" criteria. (R. 666.) He concluded that Dr. O'Donnell's report and Plaintiff's daily activities indicate that the severity of her mental impairments do not meet or equal any mental listing, but they are more than non-severe. (R. 667, 679.)

Dr. Hermsmeyer also completed a mental Residual Functional Capacity ("RFC") form, in which he concluded that Cockle was moderately limited in her ability to understand, remember, and carry out detailed instructions but had no other limitations in understanding and memory, sustained concentration and

persistence, social interaction, or adaptation. (R. 677-78.) Dr. Hermsmeyer found that despite her moderate limitations, she retained the mental capacity to perform simple one-and two-step tasks at a consistent pace. (R. 667, 679.)

Cockle received treatment from Cornerstone Services, Inc. from February 1 to April 29, 2008. (R. 711-28.) At Plaintiff's initial mental health assessment, the examiner noted a history of depression as well as injurious and suicidal behavior. (R. 719-20.) Cockle denied experiencing depression at the time but stated that she had difficulty reacting to stress around her and experienced inappropriate and excessive worry. (R. 719-20.) At the interview, Cockle appeared neat and clean and was alert and calm. (R. 723-24.) Her thought content was appropriate and she denied hallucinations, delusions, or violent ideation. (R. 724.) The examiner noted that Plaintiff's periodic depression, chronic worry, and history of suicidal behavior were clinically significant, but her inability to get sufficient information about her problems and her limited insight made it difficult to identify a particular mood or anxiety disorder. (R. 726.) The initial diagnosis was Anxiety Disorder NOS, subject to revision with further information, and she was also found to have characteristics consistent with Borderline Personality Disorder. (R. 726.)

### 3. *Illinois Dep't of Human Services - Office of Rehabilitation Services*

The DHS referred Cockle to Karen Kupina, an Employment Evaluator and Qualified Mental Retardation Professional, who evaluated Cockle from May through August 2008 and completed a Facility Evaluation Report focusing on

Plaintiff's vocational interests, work aptitudes, level of vocational functioning, and work temperament. (R. 805-09.) Kupina administered the Wide Range Achievement Test - Revised which showed that Cockle could read at the high school level but performed at the third-grade level in spelling and math. (R. 807.) To measure her level of vocational functioning, Kupina administered the Valpar Multi-Level Sorting Test, which relates to the intensity of supervision an individual requires on various tasks, particularly those requiring the use of tools. (*Id.*) She performed in the 80th percentile in errors committed but in the 15th percentile in time for completion of the tasks, for a total performance at 33% of the norm. (*Id.*)

The report also included three situational assessments, the first in a clerical position, another as a receptionist, and the last as a ticket taker/lobby attendant at a movie theater. The first assessment involved Cockle working for two hours at the Will County Development Office folding and stacking brochures. (R. 796.) The quality of her work was found to meet requirements, she was self-reliant, and her total production rate was moderate, or 50 to 75% of the norm. (R. 798.) Plaintiff's work speed increased as the assessment progressed, she folded the brochures neatly, and she responded to direction. (R. 796.) Cockle worked alone and did not have contact with coworkers during the assessment beyond an introduction and thus was not rated in her ability to cooperate with others. (R. 797-98.)

Kupina found that Cockle would benefit from coaching to become acclimated to a new position, to understand workplace policies and procedures, to work more efficiently, and to maintain appropriate professional behavior. (R. 796.) Kupina

concluded that she would recommend Cockle for that type of work, which involved a "quite simple" task. (R. 799.) Plaintiff also indicated that if she were assigned to do that type of work she would do it. (*Id.*) Kupina stated that other assessments would be necessary to explore Cockle's clerical skills and how marketable she would be in the field. (*Id.*)

In the second assessment, on August 1, 2008, Cockle worked as a receptionist for two hours at Cornerstone Services. (R. 800-04.) She was asked to alphabetize six file folders that all have last names starting with the letter S; she filed papers in an accordion file; and she worked with the building receptionist, answering incoming calls. (R. 800.) Cockle had great difficulty alphabetizing the file folders despite several additional explanations of the task and being given a printed-out alphabet for reference. (*Id.*) She had similar problems when asked to file papers in folders within an accordion file. (*Id.*) Plaintiff answered the phone in a courteous manner, and she used an appropriate volume and pleasant tone of voice when paging, but she needed assistance throughout the assessment in transferring calls. (*Id.*)

Cockle was found to be punctual, motivated, courteous, polite, and cooperative. (R. 801-02.) However, she needed substantial help to perform tasks, the quality of work was frequently below requirements, and her production rate was moderate, or 50 to 75% of norm. (R. 802-03.) Kupina concluded that despite Plaintiff's pleasant and cooperative demeanor, she was not recommended that kind of work. (R. 804.)

Kupina's report concluded that Cockle had a number of strengths, that she was friendly, polite, wants to work, and will work hard even if it is not a preferred task. (R. 808.) Kupina also noted several weaknesses, however, including Cockle's confusion with schedules, difficulty retaining new information, and lack of skills in her vocational interest area of clerical work. (*Id*.) Kupina recommended that Cockle pursue volunteer work on a consistent schedule for six consecutive months; continue attending sessions with her outpatient counselor; pursue being put on the waiting list for the Psychosocial Rehabilitation Program at Cornerstone; obtain an eye examination; attend AA meetings; continue utilizing an appointment book; and pursue obtaining her GED. (R. 808-09.) The report concluded that Cockle was not recommended for community employment at that time, encouraging her to instead complete the recommendations before seeking employment in the future. (R. 809.)

On August 29, 2008, Cockle worked in her third and final situational assessment as a ticket taker/lobby attendant at a movie theater. (R. 810-15.) Cockle worked directly with only two other employees, one at each of the jobs, and she had brief contact with a manager. (R. 810.) As a ticket taker, Plaintiff was pleasant and friendly to patrons and worked at good speed. In performing the job as a lobby attendant, which involved cleaning lobby floors, tables, and counters, she was thorough. (*Id*.) She appeared to be working cooperatively with her coworker at each job and was respectful in her dealings with a supervisor. (R. 810, 812.) Plaintiff maintained a high output of work completed, at 76-89% of the norm. (R. 812.) Kupina concluded that Cockle is very personable and cooperative as long as there is

no conflict in a given situation; however, she fails to maintain a professional manner when she disagrees on an issue. (*Id.*) Kupina would recommend Cockle for that type of work with job coaching. She was concerned that Plaintiff's method of handling conflict situations could be problematic in the workplace, and it was recommended that she work on those skills before seeking community employment. (R. 813.)

The DHS record also includes an August 29, 2008 addendum to the trial work report, which describes Cockle's behavior in the week before the final assessment at the movie theater. (R. 814-15.) The addendum states that on August 25, 2008, Cockle left a more than four-minute long voice mail for Kupina's supervisor complaining that the clothing closet door was locked; she left another long voice mail for the Director of Employment Services disputing decisions made in her first two assessments; and she came into the office unannounced and without an appointment on August 27 with the intention of talking to Kupina about clothing for the August 29 assessment. (R. 814.) The addendum concluded with several recommendations from the earlier assessment as well as the suggestion that Cockle adhere to certain listed guidelines regarding her phone and in-person professional interactions for a period of three consecutive months. (R. 814-15.) The addendum stated that Cockle could reapply for employment services after she fulfilled the recommendations. (R. 815.)

A September 25, 2008 DHS conference report also summarized Cockle's difficult interactions with co-workers during her assessments as well as with the

employment services staff. (R. 816.) The report noted that Plaintiff would become angry with the staff when she was told to wait to seek employment, and that she felt the evaluator's recommendation against employment was a personal judgment. (*Id.*) Her DHS file was closed on October 31, 2008, with the agency's finding that Cockle was not eligible for work in the community. (R. 817.)

### 4. *Vocational Expert's Testimony*

James Breen testified at the hearing as a Vocational Expert ("VE"). Breen testified that a hypothetical person limited to sedentary, unskilled work, with the additional limitation of carrying no more than fifteen pounds, could work as an eyeglass assembler (approximately 2,000 jobs), small products sorter (approximately 16,000 jobs), and printed circuit board assembler (approximately 6000 jobs). (R. 64.)

When the ALJ asked the VE to consider the additional limitation of having only superficial contact with supervisors, co-workers, and the general public, the VE responded that all of those jobs would still be available, as the assembler jobs involve working in proximity to people but not with people. (R. 64-65.) However, if the person was limited to having no contact with supervisors, other employees, or the general public, she could not perform any of those jobs. (R. 65.) Similarly, if superficial contact with others would cause concentration problems resulting in being off task for an average of fifteen minutes out of every hour, none of the listed jobs would be available. (R. 65-66.)

## C.    **ALJ Decision**

The ALJ found that Cockle had not engaged in substantial gainful activity since her application date of May 24, 2006. (R. 16.) At step 2, the ALJ concluded that Cockle had the following severe impairments: residuals of multiple fractures with rod in left leg, bipolar disorder, and dependent personality disorder. (*Id.*) At step 3, the ALJ found that none of Cockle's impairments, alone or in combination, met or equaled a Listing. (R. 17-19.)

The ALJ next determined that Cockle had the RFC to perform sedentary work, subject to the following limitations: a fifteen-pound lifting and carrying restriction and only simple, unskilled work. (R. 19.) The ALJ then concluded that given her RFC, age, and education, Cockle could perform significant numbers of jobs in the national economy, and therefore she was not disabled under the Social Security Act. (R. 21-22.)

## **DISCUSSION**

## I.    **ALJ LEGAL STANDARD**

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does

the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.  JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are support by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d. 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence,

resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III.    ANALYSIS

Cockle argues that the ALJ's decision was in error because: (1) he improperly evaluated her credibility; and (2) he failed to consider the DHS employment assessments in his decision.

### A.    Credibility

An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88).

In evaluating Cockle's credibility, the ALJ found that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 19.) This boilerplate credibility template has been sharply criticized by the Seventh Circuit, which has noted that although "the assessment of claimant's ability to work will often . . . depend heavily on the credibility of her statements concerning the

'intensity, persistence and limiting effects' of her symptoms," the template "implies that the ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). The template is thus inconsistent with SSR 96-7p(4),[4] which states that a claimant's statements about the intensity or persistence of symptoms cannot be disregarded solely because they are not substantiated by objective medical evidence. *Id.* at 646.

The mere inclusion of the boilerplate language does not by itself invalidate a credibility finding, but "[n]ot supporting a credibility determination with explanation and evidence from the record does." *Adams v. Astrue*, 880 F. Supp. 895, 906 (N.D. Ill. 2012). The ALJ in this case relied solely on the template, making no effort to explain which of Cockle's statements about her limitations were inconsistent with any particular portion of the record. Indeed, it is not even clear from the decision whether his credibility finding related to her physical limitations, mental limitations, or some combination of both. The ALJ's finding that Plaintiff lacks credibility is especially puzzling given his statement at the end of the hearing that "No[,] I don't think there's any malingering." (R. 77.) The Court therefore finds that the matter must be remanded for a more complete analysis of Cockle's credibility. *See Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011) ("[T]o read the ALJ's boilerplate credibility assessment is enough to know that it is inadequate and

---

[4] Interpretive rules, such as Social Security Regulations ("SSR"), do not have the force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

not supported by substantial evidence. That is reason enough for us to reverse the judgment.").

## B.    Incomplete RFC Analysis

Plaintiff next argues that the ALJ erred in not discussing evidence from the DHS regarding her readiness for the workforce. According to Plaintiff, the Office of Rehabilitation Services' conclusion that she was not eligible for work in the community was relevant to her RFC and should have been considered by the ALJ. The government responds that the ALJ was not required to address every piece of evidence in the record, and moreover, Cockle has not shown that the DHS reports undermine the ALJ's RFC finding.

SSR 06-03p provides that evidence in the record may include "information from other 'non-medical sources,'" which include "[p]ublic and private social welfare agency personnel, [and] rehabilitation counselors." SSR 06-03p. The ruling emphasizes that information from these non-medical sources "cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.*

Thus, the government is correct that the ALJ was not required to accord significant weight to the DHS's ultimate conclusions that Cockle was not ready for employment. However, those ultimate conclusions are not the only relevant

evidence contained in the DHS assessments. To the contrary, the DHS reports contain substantial insight about Cockle's ability to relate to others in a work setting and are consistent with other evidence in the record that Cockle may have significant limitations in her ability to work in conjunction with (or even near) others and/or take direction from supervisors. But the ALJ failed to address any of this evidence, which includes Plaintiff's testimony, mental health records, and the DHS reports. The ALJ's RFC also included no limitation on interaction with co-workers or supervisors, nor did it explain why such a limitation is unnecessary. It is possible that the ALJ gave controlling weight to the RFC opinion of Dr. Hermsmeyer, which found no limitations on social interaction, but that is mere speculation. The decision does not explain the ALJ's rationale at all and thus the Court is unable to review the RFC finding.

The failure to even mention the issue is perplexing not only because of the record evidence suggesting the limitation, but because the ALJ's questioning of the VE was substantially taken up by questions related to it. The VE's responses also demonstrate why the ALJ's error was not harmless and a full analysis of the limitation is necessary. The VE testified that there would be no jobs available for a person with Plaintiff's RFC and the additional limitation of no contact with supervisors, co-workers, or the general public. A person for whom contact would be so difficult that she would be off-task for fifteen minutes per hour would also be unemployable. On remand, the ALJ should more fully consider and discuss any

potential RFC limitations on dealing with co-workers and supervisors and, if necessary, the effect of any such limitation on Plaintiff's ability to perform work.

## **CONCLUSION**

For the foregoing reasons, Plaintiff Adrienne Cockle's motion for summary judgment [Doc. No. 19] is granted in part and denied in part, and the matter is remanded to the Commissioner for further proceedings consistent with this opinion.

**SO ORDERED.**

**ENTERED:**

**DATE:** **June 26, 2013**

**HON. MARIA VALDEZ**
**United States Magistrate Judge**